## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID S. YARNALL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CONSOLIDATED |
| vs. ) | Civ. No. 05-527-SLR |
| ) | Civ. No. 06-501-SLR |
| CORPORAL ANTHONY MENDEZ, ) | Civ. No. 06-520-SLR |
| DELAWARE STATE POLICE TROOP 7, ) | |
| PTLM LOWE and PFC BUCHERT, ) | |
| MILLSBORO POLICE DEPARTMENT, ) | |
| ) | |
| Defendants. ) | |

## AFFIDAVIT OF CORPORAL ANTHONY MENDEZ

Corporal Anthony Mendez, being duly sworn, deposes and states as follows:

1. I am a Corporal with the Delaware State Police currently assigned to the Collision Reconstruction Unit at Troop 7 in Lewes. I have been a State Trooper since November 1993. At the time I arrested the plaintiff David S. Yarnall ("Yarnall") on May 11, 2005, I was assigned to patrol at Troop 7.

2. I make this affidavit in support of the State Defendants' motion for summary judgment. I have personal knowledge of all of the facts set forth in this affidavit.

3. On the night of May 11, 2005, I started my twelve-hour patrol shift at 7:00 p.m. At 9:37 p.m., the Sussex Emergency Operations Center (SUSCOM) dispatched me to respond to a disorderly subject complaint in the area of Uncle Willie's convenience store on Long Neck Road.

4. In the parking lot of Uncle Willie's at the intersection of Long Neck Road and

Banks Road, I encountered the victim, Conrad Davenport. Davenport had been driving east on School Lane approaching Long Neck Road when a white minivan in front of him slammed on the brakes and swerved to the right. When the minivan swerved, Davenport could see a blue mountain-style bicycle in the middle of the road. Davenport stopped to avoid hitting the bicycle. A shirtless white male with tattoos on his right and left chest (later identified as Yarnall) came out of the woods, jumped on the hood of Davenport's car, and began beating the windshield with a belt.

     5.     The suspect then jumped off the hood and approached the driver's side door and reached through the open window shouting, "Move!" Fearing that the suspect was trying to steal his car, Davenport accelerated and drove into the lighted parking lot at Uncle Willie's.     6.

While interviewing Davenport, a man in the parking lot told me about another attempted carjacking which had occurred around the same time. I located the victim, Erica Donahue, in the convenience store parking lot. At around 9:30 p.m., Donahue had been driving west on School Lane when she saw a friend walking along the roadway and stopped to ask if she needed a ride. The suspect (later identified as Yarnall) came out of a wooded area and tried to open the rear passenger door, but Donahue pushed the locking mechanism and sped away.

     7.     While I was interviewing witnesses in the Uncle Willie's parking lot, a man who identified himself as Jason Bender came over and told me about another incident which had occurred at Whiskers Restaurant and Tavern (located directly across the street from Uncle Willie's). Mr. Bender identified himself as the part-owner of Whiskers. He told me that at approximately 9:40 p.m. a shirtless white male with tattoos had ridden his blue bicycle through the main tavern door and up to the bar where he started drinking another man's beer. When confronted, the man ran out of the bar leaving his bicycle.

8. I left the parking lot at Uncle Willie's and traveled south in my patrol vehicle on Long Neck Road and spotted a shirtless white male with tattoos fitting the descriptions of the suspect walking on the right shoulder in a southern direction. I pulled in behind the suspect in a darkened grassy area next to Grotto's Pizza. I exited my vehicle but first obtained my service flashlight which is stowed between the floorboard and the seat rail of the vehicle because it was dark and I needed to be able to see the suspect. I identified myself as a police officer and ordered the suspect to the ground and he got down on his knees. I then told him to put his hands behind his back and allow me to hand-cuff him, which he did. I began to get personal information so I could run a wanted check. The suspect told me his name was David S. Yarnall and his date of birth was October 3, 1969. Yarnall was highly agitated and at times incoherent and I suspected he was high on some drug like ecstasy or PCP.

9. When I started to go back to my police vehicle to run the wanted check, Yarnall got up on his feet. I advised SUSCOM by radio that the suspect was resisting and I needed assistance. I turned back to secure Yarnall but by that time he was walking away from my police vehicle towards Long Neck Road. I caught up with him, and I put my hands on his shoulders (my flashlight was still in my right hand) and directed him to get back on the ground, which he refused to do. Yarnall started to move quickly away from me so I latched onto his left arm with my left arm.

10. I tried to use an arm bar to restrain Yarnall but he continued to pull away and was dragging me towards Long Neck Road, which was heavily trafficked at the time. I tried to get my right foot in front of Yarnall to trip him to the ground but he was very strong and did not fall. Repeatedly, I directed Yarnall to stop resisting. I warned him several times that if he did not stop

resisting, I would have to use my flashlight (which was still in my right hand) to strike him.

11.     Under the circumstances, I decided that I had to increase the use of force to protect both myself and Yarnall from harm since no backup police officers had yet to arrive. I used my flashlight because it was already in my right hand and it was the most ready weapon of opportunity. To access my ASP baton, I would have had to drop the flashlight and lose the light and possibly lose hold of Yarnall. I had pepper spray but again I would have had to drop my flashlight and reach around to the left side of my duty belt. Because of our close proximity I was also concerned about a "blowback" of the spray that would disable myself. I was concerned that either Yarnall might continue to drag me into Long Neck Road or, if I let go, he would escape and run into the heavy traffic on Long Neck Road and be seriously injured or killed.

12.     After several warnings, I struck Yarnall once on the right side of his head with my flashlight because I did not believe that a blow to another part of Yarnall's body would disable him. Yarnall continued to pull towards Long Neck Road, so I struck him a second time with my flashlight on the right side of his head, causing the flashlight to drop. Yarnall stopped resisting and I escorted him back to my patrol car. I bent him over the hood of my patrol vehicle to wait for backup. Yarnall was bleeding from the head so I called for an ambulance for medical treatment.

13.     At 9:57 p.m., two Millsboro Police Officers arrived at the scene, Patrolman Roy Lowe and Patrolman First Class Todd Buchert. I had Yarnall bent forward over the hood of my patrol vehicle.  Before I knew it, Lowe grabbed Yarnall and drive stunned him with his taser. Yarnall fell to the ground and I heard Lowe order Yarnall to lie down on his stomach or "You're

gonna get it again." [1]

14.    Yarnall stood up and started to flee by running across the grassy area towards Grotto's Pizza with Lowe, Buchert, and myself in pursuit. Lowe then used his taser gun to shoot Yarnall in the back with the two barbs and stun him with an electric shock which caused him to fall to the ground.

15.    Lowe, Buchert, and myself then held Yarnall on the ground but he continued to resist by attempting to lift his arms and legs. The Indian River Volunteer Fire Company ambulance arrived at the scene along with a Sussex County Paramedic unit. They attempted to provide medical treatment, but Yarnall continued to resist and try to pull away. Yarnall was then restrained at his feet with flexible handcuffs. When he still continued to resist, the paramedics called a doctor on the radio who authorized the injection of a sedative.

16.    Yarnall was taken to Beebe Hospital for medical treatment (ten stitches). A toxicology report showed the presence of marijuana, cocaine, and PCP. After he was released from the hospital, Yarnall was taken to Troop 7 for criminal processing.

---

[1]    A taser gun can be used in two ways. The first method involves firing metal barbs into the suspect from a range of up to twenty-one feet. The barbs are fired from a compressed nitrogen cartridge. The barbs are attached to the taser by thin wires through which an electrical current (up to 50,000 volts) flows. The second method, the drive stun mode, involves the application of the taser directly to the suspect's body after removing the cartridge. Lowe first used his taser on Yarnall using the drive stun mode.

17. Yarnall was charged with two counts of attempted carjacking in the second degree (11 *Delaware Code* §835 (Class E felony); one count of criminal mischief; and resisting arrest. He plead guilty to one count of aggravated menacing (11 *Delaware Code* §602(b) (Class E felony); one count of menacing; and resisting arrest.

                                            /s/ Corporal Anthony Mendez

Subscribed and sworn before me this
4th day of January, 2007

/s/ W. Michael Tupman
Deputy Attorney General
Pursuant to 29 *Del. C.* §2508

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of May, 2007, I filed and served the Affidavit of Corporal Anthony Mendez electronically with the Court; on that same date, I mailed the original, hard-copy of that Affidavit by first-class U.S. Mail, postage prepaid, to the Clerk of the Court; and on that same date I mailed two true and correct copies of that Affidavit by first-class U.S. Mail, postage prepaid, to:

>David S. Yarnall
>I/M 548973
>Sussex County Correctional Institution
>P.O. Box 500
>Georgetown, DE 19947
>Plaintiff *pro se*

>Bruce C. Herron, Esquire
>Akin & Herron, P.A.
>1500 Shallcross Avenue, Suite 1-A
>Wilmington, DE 19806
>Attorney for Defendants Lowe and Buchert

/s/ W. Michael Tupman, Esquire

I:\TUPMAN\FILES\yarnall.mendez.aff.wpd