IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID S. YARNALL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CONSOLIDATED |
| v. | ) Civ. No. 05-527-SLR |
| | ) Civ. No. 06-501-SLR |
| CPL. ANTHONY MENDEZ, | ) Civ. No. 06-529-SLR |
| DELAWARE STATE POLICE | ) |
| TROOP 7, PTLM LOWE, UNKNOWN | ) |
| OFFICERS WHO RESPONDED TO | ) |
| SCENE OF MILLSBORO POLICE, and | ) |
| PFC BUCHERT, | ) |
| | ) |
| Defendants. | ) |

David S. Yarnall, Sussex Community Corrections Center, Georgetown, Delaware. Pro se plaintiff.

W. Michael Tupman, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants Cpl. Anthony Mendez and Delaware State Police Troop 7.

Bruce C. Herron, Akin & Herron, P.A., Wilmington, Delaware. Counsel for Defendants PTLM Lowe and PFC Buchert.

**MEMORANDUM OPINION**

Dated: September 10, 2007
Wilmington, Delaware

Case 1:05-cv-00527-SLR    Document 109    Filed 09/11/2007    Page 2 of 22

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff David S. Yarnall ("Yarnall"), who proceeds pro se, filed this civil rights lawsuit pursuant to 42 U.S.C. § 1983 as a result of actions taken during his arrest on May 11, 2005, by defendants State Trooper Cpl. Anthony Mendez ("Mendez") and Millsboro police officers PTLM Lowe ("Lowe") and PFC Buchert ("Buchert"). Also named as a defendant is Delaware State Police Troop 7 ("State Police"). Presently before the court are motions for summary judgment filed by plaintiff (D.I. 74, 75, 91, 94), Mendez and the State Police (D.I. 96), and Lowe and Buchert (D.I. 99). Plaintiff also moves to amend the conclusion of his motion for summary judgment. (D.I. 84) For the reasons set forth below, the court will grant the motion for summary judgment filed by Mendez and the State Police, grant in part and deny in part the motion for summary judgment filed by Lowe and Buchert, grant plaintiff's motion to amend/correct, and deny plaintiff's motion for summary judgment.

## II. BACKGROUND

Plaintiff alleges excessive force during his arrest on May 11, 2005, in violation of the Fourth, Fifth, Eighth, and Fourteenth Amendments. More particularly, he alleges that while handcuffed, Mendez twice struck him on the head with a flashlight. Plaintiff alleges that while not resisting and laying on the hood of the police car, Lowe attacked him with a taser, and then tasered him again even after Mendez told Lowe, "Don't do it." Plaintiff further alleges that Lowe hit him in the back of the neck and he was knocked to his knees. Plaintiff alleges he took off running because he was "scared for [his] life." As he was running, plaintiff was tasered in the back, kept running, and was tackled.

Plaintiff alleges Mendez and Buchert failed to protect him from Lowe's excessive use of force.

Much of the evening's events on May 11, 2005 were recorded by a camera in Mendez's police vehicle. (D.I. 78) The court has viewed the videotape. (D.I. 78) On the night of May 11, 2005, Mendez began working a twelve-hour patrol shift beginning at 7:00 p.m. (D.I. 97 ¶ 3) That evening, Mendez received two reports of apparent carjackings at around the same time. (Id. at ¶¶ 4-6) The individual who attempted to commit the crimes was described as a shirtless white male with tattoos on his chest. During his investigation, Mendez learned of a third incident wherein a shirtless white male with tattoos rode his bicycle through "Uncle Willie's" tavern door and up to the bar where he started drinking another man's beer. (Id. at ¶ 7) Mendez left "Uncle Willie's" parking lot and spotted a shirtless white male with tattoos (plaintiff) walking south on the right shoulder of the road who fit the description of the suspect. (Id. at ¶ 8)

By this time it was dark and, before getting out of his police car, Mendez retrieved his Mag[1] flashlight. (Id.) Mendez identified himself as a police officer and told plaintiff to lie down on the ground with his hands behind his back. (Id.) Mendez handcuffed plaintiff and obtained plaintiff's date of birth to run a warrant check. (Id.) Mendez avers that he suspected plaintiff was high on some drug like ecstasy or PCP because plaintiff was highly agitated and incoherent. (Id.) Mendez left plaintiff alone and returned to his vehicle to run a warrant check. (Id. at ¶ 9) At that time plaintiff stood up and began walking away towards Long Neck Road. (Id.) Mendez called for

---

[1]Mag flashlights are trademarks of Mag Instrument, Inc.  www.maglight.com.

backup, indicating that plaintiff was resisting arrest. (D.I. 78, 97 ¶ 9) Mendez avers that he chased plaintiff, placed his hands on plaintiff's shoulders with the flashlight still in his right hand and directed plaintiff to lay down on the ground, which he refused to do. (Id.) Mendez avers that plaintiff started to move away, so he latched onto plaintiff's's left arm with his left arm and tried to use an arm bar to restrain plaintiff who continued to pull away. (Id. at ¶ 10) Mendez avers that plaintiff was dragging both of them towards heavy traffic on Long Neck Road. (Id.) Mendez avers that he warned plaintiff, twice, that if he did not stop resisting, Mendez would have to hit him with his flashlight which remained in Mendez's right hand. (Id.) On the videotape, Mendez can be heard saying, "You're gonna get it upside your head with this flashlight" . . . "Don't try to get away again cause you're gonna get it." (D.I. 78) Mendez avers at that point he decided to increase the use of force to protect the two of them from harm because backup police officers had yet to arrive. (D.I. 97 ¶11)

After several verbal warnings, Mendez struck plaintiff once on the right side of his head with the flashlight. (Id. at 12) Mendez did not believe that a blow to any other part of plaintiff's body would disable him. (Id.) Mendez avers that plaintiff continued to struggle towards Long Neck Road, so he struck him with the flashlight a second time, again on the right side of his head. (Id.) Mendez and plaintiff are out of the camera's view at the time plaintiff is struck with the flashlight, although Mendez can be heard telling plaintiff to stop resisting, and plaintiff can be heard saying he "ain't resisting." Next, Mendez tells plaintiff he "better stay" and this is followed by unidentified noises.

Mendez avers that he used his flashlight because it was already in his right hand and the most ready weapon of opportunity. (Id. at 11) He avers that, based upon all

-3-

the circumstances, it was not feasible to use either his baton or his pepper spray. (Id.) Mendez avers that he was concerned that either plaintiff would drag him into Long Neck Road or, if Mendez let go, plaintiff would escape and run into the heavy traffic on Long Neck Road and be injured or killed. (Id.)

Mendez avers that plaintiff stopped resisting long enough to be escorted to the patrol vehicle. (Id. at 12) Mendez bent plaintiff over the hood of the patrol vehicle to wait for backup and avers that plaintiff started to resist again. (Id.) Mendez called for an ambulance for medical treatment because plaintiff's head was bleeding. (Id.)

Millsboro police officers Lowe and Buchert arrived while Mendez was restraining plaintiff at the patrol vehicle. (Id. at ¶ 13) Mendez had plaintiff bent over the hood of his patrol vehicle and he avers that, before he knew it, Lowe grabbed plaintiff and stunned him with his taser. (Id.) Lowe and Buchert both aver that when they arrived, they saw Mendez struggling with plaintiff and it appeared to them that plaintiff was trying to rise up against Mendez's attempts to restrain him on the hood of the police car. (D.I. 101 A-2, A-6) Both men saw Mendez sweating profusely and he appeared to be out of breath. (Id.) Lowe avers he applied his taser to plaintiff's back to stop his resistence and that the length of use was no longer than two to three seconds. (Id.) Plaintiff fell to the ground and Mendez then heard Lowe order plaintiff to lie down on his stomach or plaintiff would "get it again." (D.I. 97 ¶ 13)

The videotape shows Lowe's first use of the taser, but the view is obstructed for the second use of the taser. It is not clear if Lowe applied the taser a second time while plaintiff was on the ground, but in the videotape one hears the sound of the taser and a

police officer warning Lowe not to use it.[2]

Plaintiff stood up and began running across the grassy area towards Grotto's Pizza with Lowe, Buchert, and Mendez in pursuit. (D.I. 97 ¶ 14, 101 A-2, A-3) In the videotape plaintiff is seen running from the police and is heard yelling in pain when he is again tasered. Lowe had used his taser gun with taser leads and hit plaintiff in the back with the two barbs which stunned him with an electric shock, causing plaintiff to fall to the ground. (D.I. 97 ¶ 14, 101 A-3) The three men held plaintiff on the ground, but he continued to resist by trying to lift his arms and legs. (D.I. 97 ¶ 15, 101 A-3) Lowe avers that because plaintiff continued to struggle, he again applied the taser directly to plaintiff's back. (D.I. 101 A-3) Plaintiff is eventually restrained, but when he again struggles, as seen on the tape, it takes three to four police officers to control him.

The Sussex County paramedic unit arrived and its personnel attempted to provide medical treatment, but plaintiff continued to resist and pull away even after flexible handcuffs were attached to his ankles. (D.I. 97 ¶ 14, 101 A-3) Because plaintiff continued to resist, the paramedics telephoned a physician who authorized the injection of a sedative. (D.I. 77, 97 ¶ 15) Plaintiff was taken to Beebe Hospital for medical treatment. The laceration to his head was repaired with ten or more staples. (D.I. 77, 97 ¶ 16) A toxicology report indicated the presence of marijuana, cocaine, and PCP. (D.I. 77, 97 ¶ 16) The discharge diagnosis was mixed drug ingestion including cocaine, marijuana, and PCP with an additional diagnosis of multiple contusions. (D.I. 77)

Following his release from the hospital, plaintiff was taken to Troop 7 for criminal

---

[2]Lowe's affidavit does not mention this taser use nor is it clear if there was taser contact with plaintiff at this point.

processing.  (Id. at ¶ 16)  He was charged with two counts of attempted carjacking, criminal mischief, and resisting arrest.[3]  (D.I. 77, 97 ¶ 17)  Plaintiff pled guilty to one count of aggravated menacing, one count of menacing, and resisting arrest.  (D.I. 97 ¶ 17)

Plaintiff lodged a complaint against Mendez and an investigation was conducted by the Delaware State Police Internal Affairs Division.  (D.I. 77)  Corporal Smyk ("Smyk"), the on duty supervisor, reviewed Mendez's actions and the videotape and found that Mendez used the only force he had the opportunity to use and that Mendez's actions were within the Internal Affairs Divisional guidelines.  (Id.)  Smyk had concerns with the use of the taser.  (Id.)

Delaware State Police Troop 7 Commander, Captain Gregory D. Nolt ("Nolt"), determined that "all Delaware State police officers acted within divisional policies and the rules and regulations."  (Id.)  Nolt found that Mendez "did an excellent job when he secured a very combative and unruly defendant that appeared to be high on an unknown substance."  Nolt was concerned with the use of a flashlight to gain compliance from plaintiff but found that, absent such use, "there was an excellent chance" that either Mendez or plaintiff could have been more seriously injured.

Nolt stated that the use of the taser by the Millsboro police officers was unwarranted based upon his review of the videotape.  Nolt stated that, when the taser

---

[3]Mendez is the affiant in the criminal complaint filed against plaintiff.  (D.I. 77) Exhibit B of the affidavit contains details of Mendez's investigative action and, while Mendez discusses his difficulties in restraining plaintiff, he omits any reference to striking plaintiff with the flashlight.  However, he does mention the use of the taser by a Millsboro police officer.

was used, plaintiff was not combative and there was no assessment of the situation or
the needs of Mendez by either Millsboro police officer. Nolt stated that, when plaintiff
fell to the ground after the first use of the taser, it was again used despite the advise of
the other Millsboro police officer against its use. At this point, plaintiff stood up and
began to run and Nolt stated the third use of the taser was required to gain compliance
from plaintiff. (Id.)

Lieutenant Roger A. Willey ("Willey") of the Delaware State Police prepared a
detention resistance report. (D.I. 77) He concluded that Mendez was justified in the
use of a flashlight as an impact weapon. The flashlight was a weapon of opportunity,
already in Mendez's hand, and Mendez feared he was about to be dragged into a busy
roadway by plaintiff who was under the influence of drugs and demonstrated superior
strength. Willey felt, however, that Mendez should have targeted the neck, collar bone
or shoulder instead of immediately striking plaintiff in the head. (D.I. 77) Willey also felt
that the use of the taser by the Millsboro police officers was completely unwarranted.
Willey stated that Mendez had gained sufficient control of plaintiff such that he needed
only additional assistance in moving plaintiff from the hood of the police car to the rear
seat of the car until medical personnel arrived.

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions,
answers to interrogatories, and admissions on file, together with the affidavits, if any,
show that there is no genuine issue as to any material fact and that the moving party is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears
the burden of proving that no genuine issue of material fact exists. See Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

Before addressing the merits of the summary judgment motions, the court will rule upon plaintiff's motion for amendment of closing arguments which appears to amend his motion for summary judgment. (D.I.84) In the document, plaintiff presents argument in an attempt to rebut findings made by the Delaware State Police during its

-8-

investigation of the May 11, 2005 incident. The court will grant the motion to the extent that plaintiff wishes to include additional argument in support of his motion for summary judgment.

Plaintiff moves for summary judgment on the bases that Mendez violated his rights under the Fifth, Eighth, and Fourteenth Amendments when Mendez struck him with a flashlight while he was handcuffed; Mendez violated plaintiff's rights under the Fourth Amendment when he allowed "PC2"[4] to put his hand in plaintiff's pocket and remove "something";[5] Lowe violated plaintiff's rights under the Fifth, Eighth, and Fourteenth Amendments when he tasered plaintiff several times and stepped on plaintiff's head while plaintiff was handcuffed; Mendez violated plaintiff's rights under the Fifth, Eighth, and Fourteenth Amendments when Mendez did not prevent the use of excessive force by Lowe when plaintiff was handcuffed; and Buchert violated his rights under the Fifth, Eighth, and Fourteenth Amendments when Buchert did not prevent the use of excessive force by Lowe when plaintiff was handcuffed.[6] (D.I. 75)

The State Police and Mendez move for summary judgment on the bases that the Eleventh Amendment bars any claim for monetary damages against the State Police and against Mendez, in his official capacity; the claims against the State Police and Mendez, in his official capacity, should be dismissed because they are not persons

[4]A non-police witness.

[5]Plaintiff presents only argument and nothing else to support his claim that he is entitled to summary judgment on this issue. Therefore, the court will deny the motion for summary judgment on the alleged search and seizure issue.

[6]Plaintiff's motion consists of argument and case citations. He did not file any supporting documentation with his motion for summary judgment.

subject to suit under § 1983; Mendez did not use excessive force in arresting plaintiff and any responses by Mendez were objectively reasonable under the circumstances; Mendez is not responsible for the actions of Lowe; and Mendez is entitled to qualified immunity. (D.I. 96)

Millsboro police officers Lowe and Buchert move for summary judgment on the bases that they did not use excessive force while assisting Mendez in his arrest of plaintiff; in the alternative, they contend they are entitled to qualified immunity because reasonable officers in their position would not have known that their conduct violated a clearly established constitutional right; and Buchert did not fail to act to prevent the use of excessive force. (D.I. 100)

## A. Eleventh Amendment

The State Police and Mendez move for summary judgment on plaintiff's claims for monetary damages against the State Police and Mendez, in his official capacity. The Eleventh Amendment bars suits against states, see Bolden v. SEPTA, 953 F.2d 807, 813 (3d Cir. 1991), and claims made against state officials in their official capacities are treated as claims made against the state itself. Will v. Michigan Dep't. of State Police, 491 U.S. 58, 71 (1989). A state, however, may waive its immunity under the Eleventh Amendment. Such waiver must be in the form of an "unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment." Ospina v. Department of Corr., 749 F. Supp. 572, 578 (D. Del. 1990) (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 n.1 (1985)). The State of Delaware has not consented to plaintiff's suit or waived its immunity under the Eleventh Amendment. Therefore, to the extent plaintiff raises

-10-

claims for monetary damages against the State Police and Mendez, in his official

capacity, they are entitled to summary judgment as said claims are barred by the

Eleventh Amendment.

### B. Person under § 1983

The State Police and Mendez, in his official capacity, move for summary

judgment on the basis that they are not persons subject to suit under § 1983. To state a

viable § 1983 claim, a plaintiff must allege facts showing a deprivation of a

constitutional right, privilege or immunity by a person acting under color of state law.

See Daniels v. Williams, 474 U.S. 327, 330 (1986).  The claims against the State Police

and Mendez, in his official capacity, are barred by Will v. Michigan Dep't of State Police,

491 U.S. 58, 69 (1989), which holds that neither states nor state officials sued in their

official capacities for money damages are "persons" within the meaning of § 1983. See

Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005).  Therefore, as to this issue, the

court will grant the State Police and Mendez's motion for summary judgment

### C. Claims under the Fifth, Eighth and Fourteenth Amendments

The State Police and Mendez move for judgment on the claims plaintiff raises

under the Fifth, Eighth, and Fourteenth Amendments.  Plaintiff filed his claim pursuant

to 42 U.S.C. § 1983 and alleges excessive force and failure to intervene.  The

complaint and its amendment, however, do not indicate under which amendment

plaintiff proceeds.  In plaintiff's motion for summary judgment, he argues that

defendants violated his constitutional rights under the Fourth, Fifth, Eighth, and

Fourteenth Amendments.  Plaintiff alleges his constitutional rights were violated during

-11-

the course of his arrest on May 11, 2005.

Excessive force claims arising out of an arrest are analyzed under the Fourth Amendment, Graham v. Connor, 490 U.S. 386 (1989), excessive force claims for pretrial detainees are analyzed under the Fourteenth Amendment, Sylvester v. City of Newark, 120 Fed. Appx. 419, 423 (3d Cir. 2005), and excessive force claims for those convicted of a crime are analyzed under the Eighth Amendment, Graham v. Connor, 490 U.S. at 395 n.10.

Plaintiff's excessive force and failure to intervene claims under the Fifth, Eighth, and Fourteenth Amendments fail as a matter of law. Therefore, the court will grant the State Police and Mendez's motion for summary judgment on the claims raised under the Fifth, Eighth, and Fourteenth Amendments.

### D. Use of Force

Plaintiff alleges he was the victim of two types of excessive force during his arrest on May 11, 2005: 1) when Mendez used a flashlight to hit him in the head twice; and 2) when a taser was used several times by Lowe. Defendants contend that any force used was not excessive and was objectively reasonable under the circumstances.

"[C]laims that law enforcement officers have used excessive force . . . in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." Graham v. Connor, 490 U.S. 386, 395 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."

-12-

Id. at 397; Mosley v. Wilson, 102 F.3d 85, 95 (3d Cir. 1996). A court must judge the reasonableness of particular force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. The reasonableness of the officers' use of force is measured by "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. Police are permitted to use a reasonable amount of force to effect an arrest; the degree of force is dictated by the suspect's behavior. Id.

### 1. Use of Flashlight

The court first turns to Mendez's use of force when he struck plaintiff in the head with his Mag flashlight. The evidence is that plaintiff was handcuffed when Mendez used his flashlight to strike him. Mendez does not deny striking plaintiff in the head, requiring at least ten staples to close the wound.

Because excessive force claims tend to be fact specific, courts have reached different conclusions as to whether striking a suspect over the head with a blunt object constitutes excessive force. See, e.g., Sallenger v. Oakes, 473 F.3d 731 (7th Cir. 2007) (genuine issue of material fact precluded summary judgment where arrestee died after officer administered closed-fist punches and flashlight blows after arrestee was handcuffed); Baltimore v. City of Albany, Ga., 183 Fed. Appx. 891, 898 (11th Cir. 2006) (striking a suspect in the head with a heavy flashlight or other blunt instrument at least poses a "substantial risk of serious bodily injury," and constitutes deadly force); Garrett v. Athens-Clarke County, Ga., 378 F.3d 1274 1277-78 (11th Cir. 2004) (hitting suspect

-13-

once on the top of the head with the butt of a gun, combined with forcibly apprehending him and tying him up, not considered excessive force under the circumstances); Hygh v. Jacobs, 961 F.2d 359, 362, 364-65 (2d Cir. 1992) (following expert testimony that blow to the face with baton or flashlight constituted "deadly physical force," court held that "the evidence that [the officer] did in fact use excessive force against [the plaintiff] was strong"); Neeley v. Samis, 183 F. Supp. 2d 672, (D. Del. 2002) (no excessive force in use of plastic flashlight to hit arrestee several times on the back to control arrestee); John v. Berry, 469 F. Supp. 2d 922, 937 (W.D. Wash. 2006) (no excessive force in striking arrestee with flashlight in the head when arrestee actively resisted and attempted to evade arrest by flight); Marley v. Crawford County, Ark., 383 F. Supp. 2d 1129, 1133 (W.D. Ark. 2005) (genuine issue of material fact on whether arrestee was subdued when struck by deputy's flashlight precluded summary judgment); Evans v. City of Neptune Beach, 61 F. Supp. 2d 1245, 1252 (M.D. Fla.1999), aff'd, 213 F.3d 647 (11th Cir. 2000) (blow from baton to certain areas of the body is not generally likely to be lethal, but "a blow to the head or neck could very easily cause serious injury or death"); Hodsdon v. Town of Greenville, 52 F. Supp. 2d 117, 124 (D. Me.1999) ("gratuitous blow to the head with a blunt instrument would clearly constitute excessive force").

Mendez argues that the force he used was reasonable in light of all the circumstances. More specifically, plaintiff (high on drugs) was acting in an irrational, unpredictable way. When plaintiff was actively resisting arrest, he exerted enough strength to require three to four police officers to subdue him. Having viewed the videotape, it is apparent Mendez was trying to control plaintiff using a minimum of force

-14-

while waiting for back-up help to arrive. Mendez resorted to the use of his Mag flashlight (in order to protect himself and plaintiff from further danger) only when plaintiff became combative. The fact that Mendez shuck plaintiff on the head (rather than the neck, collarbone or shoulder) when he was struggling with plaintiff is not objectively unreasonable in light of the facts and circumstances confronting him.

### 2. Use of Taser

Plaintiff was handcuffed and being held down by Mendez when Lowe first used his taser. It appears from the record that plaintiff was tasered anywhere from two to three more times by Lowe, two of those tasers occurring when plaintiff attempted to flee.

The issue of whether the use of the taser constitutes excessive force is fact specific. At least one appellate court has held that "the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional." Bultema v. Benzie County, 146 Fed. Appx. 28, 35 (6th Cir. 2005); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 900-01 (6th Cir. 2004) (it was excessive for police officers to lay on top of a mentally retarded individual who had stopped resisting arrest and posed no flight risk, and spray him with pepper spray even after he was immobilized by handcuffs and a hobbling device"); Greene v. Barber, 310 F.3d 889, 898 (6th Cir. 2002) (an officer's "use of pepper spray [on a suspect actively resisting arrest] might be . . . excessive force under Graham"). However, the Eleventh Circuit has held that a "single use of the taser gun causing a one-time shocking" against a "hostile, belligerent, and uncooperative" arrestee in order to make an arrest, under the totality of the circumstances, was not excessive force. Draper v. Reynolds, 369 F.3d 1270, 1278

-15-

(11th Cir. 2004); see also, Gruver v. Borough of Carlisle, No. 4:CV 05-1206, 2006 WL 1410816 (M.D. Pa. 2006) (no excessive force when use of taser was consistent with level of resistence and there was no indication police officers applied any gratuitous force); Armbruster v. Marguccio, No. Civ.A. 05-344J, 2006 WL 3488969 (W. D. Pa. 2006) (issue of fact whether arrestee was resisting at the time of the first use of taser, but no excessive force for subsequent taser use when officers reasonably believed arrestee was resisting arrest).

There remain genuine issues of material fact on the issue of whether Lowe's action in using the taser was reasonable or excessive.  Lowe and Buchert contend that, when they arrived on the scene, they saw Mendez struggling with plaintiff and it appeared that plaintiff was trying to rise up against Mendez's attempts to restrain plaintiff on the hood of the police car.  They also  saw Mendez sweating profusely and he appeared to be out of breath.  Lowe argues that he applied his taser to plaintiff's back to stop his resistence and that the length of use was no longer than two to three seconds. It is undisputed that plaintiff fell to the ground and plaintiff was ordered to lie down on his stomach or he would "get it again."   It is not clear if Lowe applied the taser a second time while plaintiff was on the ground, but in the videotape one hears the sound of the taser and a police officer warning Lowe not to use it.

Based upon the foregoing, the court concludes that a determination of reasonableness of Lowe's actions regarding his initial taser use is more appropriately determined at trial.  Therefore, the court will deny plaintiff's and Lowe's motions for summary judgment on the issue of whether the initial uses of the taser constitutes excessive force.

-16-

This leaves the issue of Lowe's taser use when plaintiff stood up and began running across the grassy area towards Grotto's Pizza. The videotape clearly shows plaintiff running from the police and, while being pursued, at some point in time yelling in pain after he is tasered. Plaintiff alleges he began running away because he was "scared for his life." Nonetheless, he ran from law enforcement. The police eventually restrained plaintiff, but when he again struggles, as seen on the tape, it takes three to four police officers to control him. The state investigation concluded that the taser was required to gain compliance from plaintiff after he stood up and began to run.

Even when viewing the facts in the light most favorable to plaintiff, it is undisputed that, after his arrest, he ran from officers and resisted; it was reasonable and necessary for the officers to use force to gain control of the situation. Accordingly, the court will grant Lowe's motion for summary judgment on the use of the taser when plaintiff fled and will deny plaintiff's motion for summary judgment on the same issue.

**E. Failure to Intervene**

Plaintiff alleges that Mendez and Buchert did not prevent the use of excessive force by Lowe when plaintiff was handcuffed.[7] Mendez argues that he did not instruct Lowe to use his taser, did not have a realistic opportunity to prevent Lowe from initially using his taser and did not have a duty to intervene to prevent Lowe's initial use of the taser. Buchert argues that there is no evidence a reasonable jury could find that Lowe knew that excessive force would be or was being used and there is no evidence that Buchert had an opportunity and the means to prevent harm from occurring.

---

[7]There is no need to address failure to intervene as it relates to the taser use when plaintiff fled inasmuch as the court has determined that such use was reasonable.

-17-

To establish a Fourth Amendment violation for failure to intervene, a plaintiff must establish that: (1) the police officer failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was a "realistic and reasonable opportunity to intervene." See Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002); Fernandez v. Stack, No. 03-4846 (JAP), 2006 WL 777033, at *12 n.8 (D.N.J. Mar. 27, 2006). Additionally, it is plaintiff's burden to adduce evidence of both requirements. Gainor v. Douglas County, Ga., 59 F. Supp. 2d 1259, 1289 (N.D. Ga.1998) ("plaintiff must proffer evidence that the officer in question had a reasonable opportunity to intervene.").

The court must determine whether Mendez or Buchert had a realistic and reasonable opportunity to intervene by considering many factors including the temporal length of the alleged assault, the proximity of the non-intervening officer to the alleged assault, and the ability of the non-intervening officer to perceive and/or hear the alleged assault. See Riley v. Newton, 94 F.3d 632, 635 (11 Cir. 1996) (where officer "had no reason to expect the use of excessive force until after it had occurred, he had no reasonable opportunity to protect [plaintiff], and the obligation to take steps to protect him never arose."); Swinyer v. Cole, No. CO4-5348 RBL, 2006 WL 1874100, at *3 (W.D. Wash. July 6, 2006) (liability cannot attach to defendant officers because they did not have a reasonable opportunity to intercede).

Plaintiff has adduced no evidence as to whether Mendez and Buchert had a reasonable and realistic opportunity to intervene prior to Lowe's first use of the taser. Moreover, the court has reviewed the videotape and the initial use of the taser happened so quickly that neither Mendez nor Buchert had a reasonable and realistic

-18-

opportunity to prevent its use.

While not clear, there may have been a second taser use by Lowe when plaintiff was on the ground and attempting to stand up, but before he ran. Significantly, in the audio portion of the videotape officers are heard saying to Lowe not to use it, in an apparent attempt to stop him from using the taser. It is unclear if contact was made with plaintiff, although the taser sound can be heard. Plaintiff argues that Mendez could have stopped Lowe and that Buchert just stood around and did nothing. However, there is nothing in the record, and plaintiff has failed to produce any evidence, that Mendez or Buchert failed or refused to intervene during this second taser use. Additionally, the videotape reveals that someone, be it Buchert or Mendez, attempted to intervene to stop Lowe from using the taser a second time.[8] After viewing the videotape, and given the rapidity of Lowe's actions despite this verbal warning, it does not appear there was a realistic and reasonable opportunity for Mendez or Buchert to intervene. Based upon the foregoing, the court will grant Mendez's and Buchert's motion for summary judgment and will deny plaintiff's motions for summary judgment on the issue of failure to intervene.

## F. Qualified Immunity

Mendez, Lowe, and Buchert[9] argue that they are entitled to qualified immunity. More specifically, Mendez contends it would not have been clear to a reasonable police

---

[8]The individual has been identified as both Mendez and Buchert.

[9]The court is granting Buchert summary judgment on the failure to intervene issue and plaintiff has raised no other claims against him. Therefore, as to Buchert, the qualified immunity issue is moot. Additionally, the issue of qualified immunity is moot on the issue of taser use when plaintiff ran from the officers.

-19-

officer that using a flashlight to subdue plaintiff was unlawful in the situation Mendez confronted. Similarly, Lowe contends that a reasonable officer in Lowe's position would not have known that using a taser in an effort to apprehend plaintiff violated any clearly established constitutional right.

Government officials performing discretionary functions are generally entitled to qualified immunity. See Wilson v. Layne, 526 U.S. 603, 609 (1999). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Saucier v. Katz, 533 U.S. 194, 200 (2001) (quotation and citation omitted). It is "an immunity from suit rather than a mere defense to liability." Id. (quotation and citation omitted). Mendez and Lowe, as government officials, have the burden of establishing that they are entitled to such immunity. See Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004).

A two-step test is used to determine if defendants are entitled to qualified immunity. First, the court must examine whether or not the alleged conduct, taken in the light most favorable to plaintiff, violated a constitutional right. Saucier, 533 U.S. at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id. If the allegations amount to the violation of a constitutional right, the court must proceed to the second inquiry and determine if the right was "clearly established in the specific context of the case." See Brosseau v. Haugen, 543 U.S. 194, 198 (2004); Saucier, 533 U.S. at 202 (noting that an officer is entitled to qualified immunity unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

With regard to the first prong, it is undisputed that plaintiff possessed a clearly

-20-

established right to be free from the use of excessive force.  See House v. New Castle Cty., 824 F. Supp. 477, 490-491 (D. Del.1993).  The second prong requires that the court determine whether Mendez's and Lowe's actions were objectively reasonable.  As indicated by the court's earlier discussion regarding plaintiff's excessive force claims, when viewing the evidence in a light most favorable to the plaintiff, as the court must, it is apparent that there are issues of fact as to whether Lowe used excessive force in connection with the May 11, 2005 arrest.  Hence, at this juncture, the court cannot determine if Lowe's conduct was objectively reasonable or objectively unreasonable.  Consequently, the court will deny Lowe's motion for summary judgment on the issue of qualified immunity.

**V. CONCLUSION**

For the reasons discussed above, the court will grant in part and deny in part the motion for summary judgment filed by Mendez and the State Police, grant in part and deny in part the motion for summary judgment filed by Lowe and Buchert, grant plaintiff's motion to amend/correct, and deny plaintiff's motion for summary judgment. An order shall issue.